**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CAROLYN CONNER-CLEMENT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:07-cv-1154** |
| | ) | |
| **TRINITY INDUSTRIES, INC.,** | ) | **Senior Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Carolyn Conner-Clement brings this action against defendant Trinity Marine Products, Inc. (incorrectly identified in the Complaint and case caption as "Trinity Industries, Inc.") (hereinafter, "Trinity"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Tennessee Human Rights Act ("THRA"), the Tennessee Workers Compensation Act and the Tennessee common law for discrimination on the basis of sex, race and disability, as well as "retaliatory harassment, retaliatory discharge . . . , retaliation, hostile work environment, malicious harassment, outrageous conduct, and negligent infliction of emotional distress suffered as a result of Defendant's racial and handicap discrimination, retaliation and hostile work environment." (Compl. ¶ 1.)

Now before the Court is defendant Trinity's Motion for Summary Judgment (Doc. No. 21) as to all claims asserted by the plaintiff. For the reasons explained below, the Court will grant the defendant's motion in its entirety.

**I.      FACTUAL BACKGROUND**

Trinity operates a shipyard in Ashland City, Tennessee and is engaged in the fabrication and assembly of tank barges that carry liquid cargo. Conner-Clement, an African-American woman, was employed by Trinity in January 2000 as a Welder Trainee. She became a First Class Welder in May 2001. The physical requirements of the position of First Class Welder include standing continuously for three to seven hours at a time, frequently bending, continuously lifting twenty pounds, frequently lifting sixty pounds and occasionally lifting eighty pounds. The welding equipment used by Conner-Clement

alone, including the wires, weighs sixty to sixty-five pounds.

Conner-Clement suffered a work-place injury on March 31, 2005 when she was crushed between a crane or forklift and a welding deck. (*See* Pl. Dep. (Doc. No. 26-1) at 36:9–24.) Just over a week after her injury, Conner-Clement's physician released her to light-duty work with a temporary lifting restriction of no more than fifteen pounds. In accordance with Trinity's Transitional Work Assignments procedures, transitional work was found for Conner-Clement to perform within several different departments while the temporary work restrictions were in place. The transitional or "light-duty" tasks Conner-Clement performed after she returned to work but before reaching maximum medical improvement were only temporary assignments, not permanent positions with a regular job classification. Conner-Clement spent approximately a year on light-duty assignments prior to reaching maximum medical improvement. During this period, she was pad the full hourly rate she had received as a Welder.

Conner-Clement's first temporary light-duty assignment following her injury was in the safety department under Ken Myers. In that post, Conner-Clement spent approximately five months sweeping, mopping and picking up garbage. Her second temporary light-duty assignment was in the maintenance department where she was supervised by Don Swafford. She claims to have spent from four to six months at that assignment. During her assignment to the maintenance department, Conner-Clement performed data-entry work, counted parts, and ordered parts. The data-entry work involved working with Excel spreadsheets and Microsoft Word. Ricky Rose, an hourly co-worker, spent part of every day helping teach Conner-Clement how to use Excel for data entry. Conner-Clement never created an Excel spreadsheet. Rather, she worked with spreadsheets that already existed. She never created any formulas for use in the Excel spreadsheets she used. Conner-Clement's third temporary light-duty assignment was working under the supervision of Tommy Hatfield performing data entry "dealing with money" and copying spreadsheets onto discs. (Pl. Dep. at 51:24–53:6.)

Conner-Clement remained on light-duty until her employment was terminated on March 27, 2006. Prior to her termination, on or about August 29, 2005, Don Swafford, Maintenance Manager, submitted a request for the creation of a new position within the Maintenance Department, that of Maintenance Analyst. The Maintenance Analyst position that Swafford sought to create was a semi-professional position, not a clerical position or a "Maintenance Secretary" position, although Conner-Clement has

repeatedly referred to it as such.

Conner-Clement, in her response to the defendant's statement of undisputed facts, attempts to refute Trinity's characterization of the position as semi-professional and non-clerical by asserting that she "had been performing this job while on light duty and was told she was doing a good job." (Doc. No. 28, Resp. to ¶ 21.) The deposition testimony referenced in support of her assertion actually concerns her claim that she was told by Hatfield that she was doing a good job in the temporary position she held under his supervision for the last couple of months before her employment was terminated. (*See* Pl. Dep. at 56, 99.) There is no competent evidence in the record that the work she performed under Hatfield's supervision was a permanent job or that anyone was hired to fill that position after Conner-Clement was fired.

In any event, Swafford's request to form the new job position in the Maintenance Department was approved on or about September 2, 2005, and a Maintenance Analyst job vacancy was posted in accordance with Trinity's job vacancy posting procedures. The requirements of the Maintenance Analysis position, as set forth in the job posting, included the following:

> Extensive computer knowledge including MS Office (including Word, Excel, PowerPoint, Etc.), ability to competently surf the internet, and data entry skills.
>
> 6 months – 2 years experience using MS Excel spreadsheets.
>
> Attention to detail in order to make sure that data is input correctly.
>
> Working knowledge of inventory systems and maintaining inventory levels.
>
> Knowledge of maintenance/facility products and their manufacturing processes, or the ability to acquire it quickly.
>
> Good organizational skills to ensure timely ordering of parts.
>
> Ability to maintain working relationships and communicate effectively with co-workers and vendors in a variety of settings.
>
> General knowledge of Maintenance and Electrical parts.

(Doc. No. 25-3 (9/8/2005 Job Vacancy Posting).)

According to Trinity's job vacancy posting procedures, a Job Vacancy Posting is posted at the facility so that employees who are interested in a position and believe they are qualified for it can indicate their interest by signing the posting. An employee must show interest in a position in order to be considered for it. Conner-Clement and another Trinity employee, Jerry Harris (a white male) both signed

the job posting on September 6, 2005 indicating their interest in the Maintenance Analyst position. (*See id.*) Don Swafford met with both Conner-Clement and Harris about the position. He considered these meetings to be interviews. Although Conner-Clement asserts she was not "interviewed" for the Maintenance Analyst position, she does recall that after she signed the position posting, she and Don Swafford talked about her interest in and qualifications for the Maintenance Analyst position. Conner-Clement told Swafford that she thought she could "learn by working with Ricky Rose everything [they] need [her] to learn on the computer." (Pl.'s Dep. at 183:11–12.) She also communicated with Swafford "about her computer skills or lack thereof," and she recalls that Swafford stated "it was up to the company who they were going to hire for that spot." (*Id.* at 13–23.)[1]

According to Swafford, his meeting with Conner-Clement left him with the impression that she did not possess the computer skills needed to perform the job of Maintenance Analyst. Harris actually withdrew his bid and told Swafford he did not have the requisite computer skills or knowledge base for the position. Prior to her employment at Trinity, Conner-Clement did not have any background in computers.[2] She has never taken a course on Microsoft Excel or Microsoft Word, and her first experience with using these programs or working on a computer at all was while she was on light-duty work at Trinity after her March 2005 accident.

The Maintenance Analyst position was posted again on or about December 5, 2005. Conner-Clement did not sign the job-posting to indicate her interest this time. (Doc. No. 25-5 (12/5/2005 Job Vacancy Posting).) She asserts, however, that she was never made aware of this second posting and that she had repeatedly communicated her continuing interest in the job. The Maintenance Analyst position was also posted online so that external candidates could apply. In February 2006, a white, male external candidate named Charles McDaniel applied for the Maintenance Analyst position, was offered the job, and began work on or about February 17, 2006.

---

[1] Conner-Clement also alleges that Swafford told her she was "illiterate." (Pl. Dep. at 183:25.)

[2] In her response to the defendant's statement of undisputed facts, the plaintiff denies this assertion, claiming she has experience with Microsoft Word. The deposition testimony referenced in support of this claim, however, establishes that she had no experience with computers prior to working for Trinity. (Doc. No. 28, Resp. to Statement No. 30; Pl.'s Dep. at 30:23–31:15 (confirming that her first experience with Microsoft Word was during her employment at Trinity).)

Prior to accepting the job at Trinity, McDaniel had worked as Maintenance Planner/Scheduler for Blue Diamond Almond Growers for eight years, had other "parts" work experience and extensive computer skills. According to McDaniel's application materials, at Blue Diamond he had been responsible for planning and scheduling maintenance, maintaining a database, maintaining a more-than-10,000-part inventory, generating departmental reporting, purchasing parts, and dispatching breakdown calls. His employment application further indicated that as of February 2006, he had at least one year of experience in electrical maintenance, mechanical maintenance, pneumatics maintenance, maintenance supervision, maintenance reporting, calculators, word processing, spreadsheets, working with databases, and computer peripherals. After McDaniel began working at Trinity, he eliminated the old spreadsheet system and developed a new "rather sophisticated" spreadsheet system for maintenance and inventory tracking. (Swafford Decl. ¶ 7.)

Conner-Clement does not dispute that McDaniel's prior work experience closely matched the posted requirements for the position. She also admits he has computer skills that she does not have. (Pl. Dep. at 90:22–24.) However, she also denies that he was more qualified than she on the basis that (1) he knew nothing about how the company was run (Pl. Dep. at 90:20–21) and (2) she helped train him (Pl. Dep. at 89:22–90:13). In addition, after McDaniel began working as Maintenance Analyst, Conner-Clement continued for several weeks to perform some of the maintenance data entry and continued keeping inventory. During that timeframe, McDaniel was, according to Conner-Clement, "working on the computers." (Pl. Dep. at 89:19–21.)

On March 9, 2006, Conner-Clement underwent a functional capacity assessment to evaluate her ability to return to her Welder position. Conner-Clement indicated during the course of her assessment that she was unable to bend at all, could sit for up to forty-five minutes at a time, and could stand without breaks up to sixty minutes at a time. On or about March 16, 2006, Conner-Clement's physician opined that Conner-Clement had reached maximum medical improvement but that she was subject to permanent work restrictions, including a fifty-pound lifting restriction and no more than occasional bending and stooping. Conner-Clement concedes that these restrictions precluded her from performing the essential functions of her Welding job.

After Trinity was apprised of Conner-Clement's permanent restrictions, the company followed its procedures for determining whether her permanent work restrictions could be accommodated. Trinity determined that there were no open positions that would accommodate her restrictions. According to the Request for Accommodation completed by Trinity in connection with this process, several individuals participated and concurred in this decision, including: Ken Myers, Safety Manager; Kenneth Lacky, Plant Manager; Katharine Alford, Corporate Safety Representative; Jim Hargrove, Division Safety Manager, and Rex Cottle, Corporate HR. (*See* Doc. 24-2, at 2.) Doug Hunter and Ken Myers met with Conner-Clement on March 27, 2006 to inform her that her employment was being terminated on the basis that there were no open positions at Trinity's Ashland City facility that could accommodate her permanent restrictions. As indicated above, Conner-Clement maintains that she could have performed the duties of Maintenance Analyst, which she claims she had been performing for the three months prior to her termination.

Conner-Clement filed a charge with the EEOC by June 22, 2006 asserting claims of race and sex discrimination and retaliation. On her EEOC charge, she did not check to box next to "disability." (*See* Doc. No. 26-7.) In the narrative section describing her claims, she claims she was subject to "racial slurs" and asserts that the failure to promote her and her discharge were discriminatory. (*Id.*) She filed her Complaint in the instant action on November 21, 2007. In her deposition, she testified that her discrimination and retaliation claims are based entirely on the following allegations: (1) she was the sole black female employed at Trinity's Ashland City plant; (2) she was subjected to drug testing once per year before her injury in March 2005 but one a month after her injury, and she was required to submit to drug testing at the time of her injury while Adam Hull, the white male also involved in the accident, was not, and no one else was required to submit to monthly drug testing; (3) during the first few months of her employment, she was required to work on ladders even though she was afraid of heights, while a white female who also professed to be afraid of heights was not required to work up high on ladders; (4) she was called a "nigger" on two occasions by the same person, a co-worker named Gner Alvavadi, once on April 3, 2005 and once prior to that, and the word "nigger" was written on the wall of the men's bathroom once, prior to March 2005; and (5) her employment was terminated. (Pl. Dep. at 63–65, 73–75, 81.)

II. **STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the moving party has carried this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts based on evidence in the record showing that there is a genuine issue for trial. *Id.*; *accord* Fed. R. Civ. P. 56(e)(2).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the" non-moving party. *Anderson*, 477 U.S. at 252.

## III.     ANALYSIS AND DISCUSSION

In her Complaint, Conner-Clement asserts that she was (1) denied the Maintenance Analyst position and terminated based on race discrimination in violation of Title VII and the THRA; (2) terminated

based on disability discrimination in violation of the ADA and the THRA; (3) subject to racial harassment in violation of Title VII and the THRA; (4) subjected to retaliation and retaliatory discharge for making a claim for Workers' Compensation benefits; and (5) subjected to "malicious harassment," outrageous conduct, and negligent infliction of emotional distress. Trinity maintains that many of Conner-Clement's claims, including any claims under the ADA and Tennessee state law, including the THRA, are barred by the applicable statutes of limitation or because of her failure to exhaust administrative remedies. Trinity further asserts that Conner-Clement lacks requisite proof to support any of her remaining claims and that Trinity is entitled to judgment in its favor as a matter of law based on the undisputed facts. Each of the defendant's arguments is addressed separately below.

####    A.    Plaintiff's State-Law Claims Are Time-Barred.

Under Tennessee law, claims brought under the THRA as well as claims for personal injury generally are subject to a one-year statute of limitations. *See* Tenn. Code Ann. § 4-21-311(d) (providing that THRA claims must be filed within one year after the alleged discriminatory practice ceases); Tenn. Code Ann. § 28-3-104 (establishing a one-year statute of limitations for torts involving injuries to the person); *Stewart v. Memphis Hous. Auth.*, 287 F. Supp. 2d 853 (W.D. Tenn. 2003) (recognizing that a one-year limitations period applied to the plaintiff's state-law tort claims including claims under the THRA as well as claims of invasion of privacy, intentional and negligent infliction of emotional distress, outrageous conduct, and wrongful termination); *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 682 (Tenn. Ct. App. 1999) (applying the one-year limitations period prescribed in Tenn. Code Ann. § 28-3-104 to a plaintiff's claim that she was discharged in retaliation for having filed a workers' compensation claim) (citing *Weber v. Moses*, 938 S.W.2d 387 (Tenn. 1996)). In addition, the filing of an EEOC charge or other administrative action does not toll the one-year state statutes of limitations. *Burnett v. Tyco Corp.*, 932 F. Supp. 1039 (W.D. Tenn. 1996) (citing *Bennett v. Steiner-Liff Iron & Metal Co.*, 826 S.W.2d 119, 121 (Tenn. 1992)).

There is no dispute in this case that Conner-Clement's employment terminated on March 27, 2006. She did not file suit until November 21, 2007, nearly twenty months after the last possible date upon which any discriminatory action could have occurred. Consequently, all of Conner-Clement's state-law claims—including the claims under the THRA as well as those for outrageous conduct, negligent

infliction of emotional distress, malicious harassment, and retaliatory discharge—are time-barred and must be dismissed. On that basis alone, Trinity is entitled to judgment in its favor as to all Conner-Clement's tort claims asserted under Tennessee law, which the plaintiff basically concedes in her response memorandum. (*See* Doc. No. 27, at 4 (acknowledging the acts giving rise to the claims took place more than a year prior to the filing of the complaint and therefore "tak[ing] no position" on the issue of whether the claims are time-barred).) Trinity's motion for summary judgment in its favor as to those claims will therefore be granted.

### B.     Plaintiff's ADA Claim Must Be Dismissed.

In its Memorandum in support of summary judgment, Trinity points out that Conner-Clement never checked the box indicating she intended to assert a claim for disability discrimination and that relevant Sixth Circuit case law therefore requires that the claim be dismissed for failure to exhaust administrative remedies. (See Doc. No. 22, at 9–10.) The defendant also points out that, even if the claim were not time-barred, the ADA claim would be subject to dismissal on the merits because there is no evidence in the record that Conner-Clement had a disability or was regarded as having a disability for purposes of the ADA during her employment at Trinity. *See* 42 U.S.C. § 12102(2) (defining the term "disability"); *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (citing 42 U.S.C. § 12102(s) and discussing the requirements for proving disability for ADA purposes). In her response to the motion for summary judgment, Conner-Clement concedes that she has no factual basis to support a claim for disability discrimination, as she admitted in her deposition that she did not believe that her termination or failure to promote were based on her alleged disability. (*See* Doc. No. 27, at 5 ("However, since Plaintiff admitted in her deposition that she was not terminated because of a disability, this is a moot point.").)

Although Conner-Clement actually did assert in her deposition that she thought the failure to interview her for the Maintenance Analyst position was based on her disability (Pl. Dep. at 98:7–11),[3] the Court agrees that this claim must be dismissed for failure to exhaust administrative remedies and because, even if the plaintiff had exhausted remedies, there is no evidence in the record that she had a disability or was regarded as having a disability as those terms are defined by the ADA. The motion for

---

[3] She also acknowledges, however, that she spoke with Swafford about the job qualifications and whether she met those qualifications. (*See* Pl.'s Dep. at 183.)

summary judgment as to the ADA claim will therefore be granted.

C.    **Plaintiff's Title VII Claims Based on Conduct that Occurred before August 27, 2005 Are Time-Barred.**

Trinity argues that any claims based on alleged actions that took place more than three hundred days before Conner-Clement filed her EEOC charge on June 22, 2006 are time-barred pursuant to 42 U.S.C. § 2000e-5(e)(1).  The actions about which the plaintiff complains that appear to have taken place more than three hundred days before June 22, 2006, that is, before August 27, 2005, include the following:  (1) Trinity required her, but not her co-worker Adam Hull, to submit to drug-testing at the time of her injury in March 2005; (2) her supervisor required her to work on ladders during the first few months of her employment, in 2000 or 2001, even though she was afraid of heights; (3) a co-worker called her "nigger" twice, once on April 3, 2005 and once sometime prior to that date; and (4) someone wrote "nigger" and drew an offensive picture on the men's bathroom wall at some point prior to March 2005. Conner-Clement does not dispute that "anything prior to August 27, 2005 is time-barred." (Doc. No. 27, at 5.)  The Court agrees that claims based upon the above-referenced actions that all took place well before August  2005 are time-barred.

D.    **Plaintiff Has Not Stated a Claim for Sexual Harassment.**

Essentially the only claims asserted in the Complaint that are not time-barred are those asserted under Title VII for discrimination, on the basis of either race or sex, based on Trinity's failure to promote Conner-Clement to the Maintenance Analyst position she sought and its decision to terminate her employment on March 27, 2006.  In her response to the defendant's motion for summary judgment, however, Conner-Clement asserts that she was subjected to sexual harassment and a sexually hostile work environment by a supervisor, and that she was denied the position in question for "refusing to perform sexual favors for a supervisor" named Johnny Wallace.  (Doc. No. 27, at 7.)  She attempts to create a disputed issue of fact as to those issues by pointing to portions of her own deposition testimony that are not actually in the record before this Court.

Because nearly all the evidence to which the plaintiff points is not in the record, this Court cannot consider it, and therefore finds that Conner-Clement has not created a material issue of fact as to whether she was subject to sexual harassment. *See* Fed. R. Civ. P. 56(e)(2) (providing that the party opposing summary judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts

showing a genuine issue for trial"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (noting that parties opposing summary judgment must produce some type of evidentiary material in support of their position).

Even more critically, as Trinity points out, although Conner-Clement arguably stated a claim in her Complaint for sexual discrimination based on the failure to promote and the termination of her employment, she did not remotely state a claim for sexual harassment or sexually hostile work environment, nor has she at any time sought to amend her Complaint based upon the testimony elicited during her deposition. In addition, she did not premise her EEOC charge upon hostile work environment or sexual harassment. A judicial complaint, and thus the federal courts' authority over a discrimination claim, is limited "to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991) (quoting *EEOC v. Bailey Co., Inc.*, 563 F.2d 439, 446 (6th Cir. 1977), *cert. denied*, 435 U.S. 915 (1978)); *see also Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001).

This Court finds that a claim for sexual harassment and hostile work environment would not reasonably be expected to grow out of the investigation of the discrimination claims asserted in the EEOC charge, which specifically refers only to "racial slurs" experienced during plaintiff's employment, Trinity's failure to promote her, and her subsequent termination. *Cf. Ang*, 932 F.2d at 546 (affirming the district court's determination that the plaintiff's race discrimination claim was barred because he had listed only "national origin" as the basis for discrimination in his EEOC charge); *Ulmer v. Dana Corp.*, 200 F. Supp. 2d 804 (N.D. Ohio 2002) (granting summary judgment for the defendant on the plaintiff's claim that he had been subjected to a racially hostile work environment on the basis that "the relevant EEOC charge alleges conduct relating to failure to promote and retaliation" but contained no allegations "that would have reasonably given rise to an investigation of a hostile work environment claim"), *aff'd*, 115 Fed. Appx. 787 (6th Cir. 2004); *Sunstrom v. Schering-Plough Corp.*, 856 F. Supp. 1265, 1274 (E.D. Tenn. 1994) (where the plaintiff's EEOC charge primarily referenced her discharge and made "a general claim" that she had received lower wages than male employees doing the same job, but did not mention any denial of promotions or bonuses based on her sex or age, the court held that allegations in her complaint pertaining to bonus payments and promotions did not "reasonably fall within the scope of the investigation which would be triggered by the allegations in the charge").

Because Conner-Clement did not assert a sexual harassment/hostile work environment claim in her Complaint or her EEOC charge, and because most of the evidence to which she cites in support of her allegations is not in this Court's record, the Court will not consider Conner-Clement's arguments in response to summary judgment that she was subjected to a sexually hostile work environment. To the extent Conner-Clement is attempting to assert such a claim now, it necessarily fails.

      **E.**      **Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on Trinity's Failure to Promote Her or Trinity's Decision to Terminate Her Employment.**

Conner-Clement brings her claims pursuant to Title VII's general anti-discrimination provision, 42 U.S.C. § 2000e-2(a)(1). She has not evinced an intent to bring a mixed-motive claim under 42 U.S.C. § 2000e-2(m), and she seeks to establish her claims with indirect rather than direct evidence. Consequently, her claims "are subject to the tripartite burden-shifting framework" first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (some citations omitted). Under this framework, Conner-Clement bears the burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at 253. Once the plaintiff establishes her *prima facie* case or, in the context of a motion for summary judgment, at least a disputed issue of fact as to each of the elements thereof, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment decision. *Burdine*, 450 U.S. at 253. If the defendant meets its burden of production, then the burden shifts back to the plaintiff to establish that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. *Id.*

In the instant case, Conner-Clement is unable to establish a *prima facie* case of discrimination in connection either with Trinity's failure to promote her to the position of Maintenance Analyst or its decision to terminate her employment. The Court therefore does not reach the question of pretext.

      *(1)*      *The Failure to Promote*

In the context of a failure-to-promote employment discrimination case, the Sixth Circuit has modified the elements of the *prima facie* test to fit the specific circumstances. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000). Under *Nguyen*, a plaintiff with a discrimination claim based on a failure to promote must demonstrate that (1) she is a member of a protected class; (2) she

applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied. *Id.* at 562–63. The fourth prong may also be satisfied by a showing that "the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications." *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 n.3 (6th Cir. 2005) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).

Here, there is no question that Conner-Clement, being black and female, is a member of at least two protected classes and therefore has satisfied the first element of the test. Likewise, there is no dispute that she was denied the position sought, that of Maintenance Analyst. The Court agrees with Trinity, however, that Conner-Clement cannot meet the second or fourth elements of her *prima facie* case: that she was qualified for the position sought or that the individual who received the job had similar qualifications to hers.

Trinity has demonstrated that the listed requirements for the position of Maintenance Analyst included, among others, "[e]xtensive computer knowledge including MS Office (including Word, Excel, PowerPoint, Etc.), ability to competently surf the internet, and data entry skills," and "6 months – 2 years experience using MS Excel spreadsheets." (9/8/05 Job Vacancy Posting, Doc. No. 25-3; 12/5/05 Job Vacancy Posting, Doc. No. 25-5.) Despite the fact that Conner-Clement spent approximately four to six months doing some computer work while she was on light duty recovering from her accident, there is no dispute that she did not have "extensive computer knowledge." She had no prior training or experience working on a computer at all before being temporarily assigned to maintenance while she was on light duty (*see* Pl. Dep. at 30:23–31:15), so in that position she was in the process of learning on the job how to enter data and work with Microsoft Excel spreadsheets. She never actually created any Excel spreadsheets nor created a formula for use in an Excel spreadsheet. (Pl. Dep. at 51:17–12.) During the few months she spent working in the Maintenance Department, a co-worker spent part of every day teaching her to use Microsoft Word and Excel. (Pl. Dep. at 50:12–19.) In other words, Conner-Clement has not presented sufficient evidence from which a reasonable juror could find that she was qualified for the job as posted.

In her deposition, Conner-Clement testified that she believed she was qualified for the

Maintenance Analyst position because (1) she continued to perform some data entry and to "keep inventory" even after McDaniel was hired as the Maintenance Analyst (Pl. Dep. at 89:13–15); and (2) she trained McDaniel in how to use the spreadsheets she had been using and to keep track of repair work and inventory. (Pl. Dep. at 89:22–90:16.) The fact that Conner-Clement continued to do some work for the maintenance department after McDaniel was hired only serves to show, rather, that her tasks did not actually overlap with those required by the new position. Moreover, the fact that Conner-Clement showed McDaniel what she had been doing and how the spreadsheets the company used were set up does not establish that she was actually training him to *use* the programs as opposed to merely showing him how the company had been keeping track of various functions. Indeed, Trinity has presented evidence that once McDaniel began work as the Maintenance Analyst, he did away with the spreadsheet system Conner-Clement had been using for data entry and developed a completely new system for maintenance and inventory tracking.

In other words, even if Conner-Clement were able to establish that she was qualified for the job, she cannot refute Trinity's evidence that McDaniel was substantially better qualified than she. In the Sixth Circuit, in order to satisfy the fourth prong of her *prima facie* case, Conner-Clement needs to show that she and McDaniel had similar qualifications. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (citing *Williams v. Columbus Metro. Hous. Auth.*, 90 Fed. Appx. 870, 873 (6th Cir. 2004); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003); *Nguyen*, 229 F.3d at 562–63). She cannot make the requisite showing in this regard. She has admitted that McDaniel had computer skills she herself did not possess. In addition, McDaniel's employment application shows that he had at least one year of experience in electrical and mechanical maintenance, pneumatics, maintenance supervision, maintenance reporting, word processing, spreadsheets, data entry, and computer peripherals, and he had at least eight years' worth of relevant job experience in his most recent job position prior to going to work for Trinity. No reasonable juror could fail to recognize that McDaniel was exponentially better qualified than Conner-Clement for the position of Maintenance Analyst. Consequently, Conner-Clement cannot establish the fourth element of her *prima facie* case of discrimination based on the failure to promote.

Because Conner-Clement has not presented competent evidence creating a material issue of

disputed fact as to whether she was similarly situated to McDaniel in terms of their job qualifications, she cannot make out a *prima facie* case of discrimination, based on either race or sex, premised upon Trinity's failure to promote her to the position of Maintenance Analyst.

To the extent Conner-Clement is attempting to state a claim based on Trinity's failure to hire her in a permanent capacity under the supervision of Tommy Hatfield, that claim also fails.  She has not established that there was actually an open position in that department, and her discrimination claim is premised on a vague assertion, based entirely on hearsay, that a white woman was hired to some position under Tommy Hatfield's supervision after she was fired.  (*See* Pl. Dep. at 56:4–21 (explaining that "[p]eople at work" told her "another white lady" was hired to work for Tommy Hatfield after she left).)  Trinity denies that there was any such permanent position or that a white woman was hired into some position that she would have been qualified for that was open at the time of her termination.  (*See* Myers Dep. (Doc. No. 31-2) at 27:2–4.)  Any claim based on the failure to hire her to continue working under Tommy Hatfield's supervision also fails for lack of evidence to support a *prima facie* case of discrimination, as there is no evidence that a position was available, what its requirements were, or who was hired to fill it.

Trinity is entitled to summary judgment in its favor as to Conner-Clement's claim of race or age discrimination based on the failure to promote her.

### *(2)     The Termination of Conner-Clement's Employment*

To establish a *prima facie* claim of either race or sex discrimination based on her discharge, Conner-Clement must show that (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside her protected class or treated differently than similarly situated non-protected employees.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).  While Conner-Clement clearly is a member of a protected class on the basis of both her race and her gender, and she was subject to an adverse employment action, Trinity maintains she cannot prove either the third or fourth element of her *prima facie* case.  The Court agrees.

With respect to the third element, Conner-Clement herself readily admitted in her deposition that she was not qualified to return to her Welder position as a result of her permanent medical restrictions.

She also concedes that the light-duty tasks to which she was assigned after her injury and up until she reached maximum medical improvement were temporary assignments, not permanent positions with a regular job classification. As discussed above, she cannot show that she was qualified for the position of Maintenance Analyst, nor has she established that there were any other open positions at Trinity at the time of her discharge for which she was qualified, medically or otherwise.

As for the fourth element, Conner-Clement has not pointed to any individual outside her protected class who was treated more favorably. She was unable to identify any person with a fifty-pound lifting restriction who was allowed to continue working at Trinity in any capacity on a permanent basis. In addition, although she vaguely asserted in her deposition that a white woman was hired to work with Tommy Hatfield after she left, that assertion was based solely on hearsay, and Trinity has presented evidence that that there was no such position.

Because Conner-Clement has failed to offer evidence sufficient to support a *prima facie* case of race or sex discrimination based upon her termination, the Title VII discrimination claims based on that action also fail.

## IV.    CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment will be granted in its entirety and this matter dismissed.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge